ZILLY, Senior District Judge,
concurring in part and dissenting in part:
For over 11 years, plaintiffs[1] have been seeking justice in our courts for the role that two U.S. corporations allegedly played in atrocities committed in the Republic of Colombia. On December 13, 1998, one or more cluster bombs were dropped from a Colombian Air Force helicopter onto the village of Santo Domingo, killing 17 unarmed civilians, including six children, and wounding 25 others. Plaintiff Mario Galvis Gelvez (“Galvis”) was seriously injured in the raid, and his wife, daughter, and niece were among the massacred. Although the pilot and co-pilot of the helicopter were convicted of murder and sentenced to 30 years in prison, plaintiff Galvis received only $55,800, and each of his sons received only $21,762, in “symbolic” compensation from the Colombian government. To date, defendant Occidental Petroleum Corporation (“Occidental”), a California corporation, and defendant AirScan, Inc. (“AirScan”), a Florida corporation, have not been required to answer for their alleged participation in the planning and execution of the attack on Santo Domingo.
Instead, plaintiffs’ claims against these U.S. corporations, brought pursuant to the *616 Alien Tort Statute (“ATS”), 28 U.S.C. § 1350, were dismissed on improper grounds, and their appeal from this erroneous decision has been unreasonably delayed for close to a decade.[2] Unfortunately, plaintiffs’ long ordeal might now end with the majority affirming the dismissal of plaintiffs’ ATS claims by relying on a distinguishable Supreme Court decision, Kiobel v. Royal Dutch Petroleum Co., — U.S. -, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013), announced almost eight years after the district court granted defendants’ Rule 12(b)(6) motion. The majority also affirms the dismissal of plaintiffs’ related state law claims by applying an unfamiliar rendition of the international comity doctrine, without addressing whether the district court correctly premised its decision on the foreign affairs doctrine. In its unwieldy opinion, which inappropriately reaches issues not before us, the majority does nothing but “keep the word of promise to our ear, [a]nd break it to our hope.” See id. at 1677 (Breyer, J., concurring in the judgment). Because the majority would, without good reason, deny plaintiffs the right to seek basic justice, I must dissent.[3]
A. Alien Tort Statute Claims
The ATS provides that “[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.” 28 U.S.C. § 1350. In Kiobel, the Supreme Court held that this jurisdictional statute does not apply unless the ATS claims “touch and concern” the United States “with sufficient force to displace the presumption against extraterritorial application.” 133 S.Ct. at 1669. The majority misinterprets Kiobel as requiring, in addition to a defendant’s U.S. citizenship, “conduct” that occurred within the United States. For both procedural and substantive reasons, the majority is wrong to impose this standard on plaintiffs in this case.
In 2005, at the time the district court ruled on defendants’ Rule 12(b)(6) motion to dismiss, Kiobel had not yet begun its path to the Supreme Court. See Mujica v. Occidental Petroleum Corp., 381 F.Supp.2d 1164 (C.D.Cal.2005); see also Kiobel v. Royal Dutch Petroleum Co., 456 F.Supp.2d 457 (S.D.N.Y.2006), aff'd in part, rev’d in part, 621 F.3d 111 (2d Cir.2010), aff'd, — U.S. -, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013). The district court based its dismissal of plaintiffs’ ATS claims on the political question doctrine,[4] and *617 plaintiffs’ initial appearance before us, as well as their first brief submitted to us following the limited remand, predated the Supreme Court’s decision in Kiobel. Plaintiffs have never been given an opportunity at the district.court level to amend their complaint in light of Kiobel or to move for jurisdictional discovery or similar relief. See Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 430 n. 24 (9th Cir.1977) (“a court may allow discovery to aid in determining whether it has in personam or subject matter jurisdiction”).[5] The majority ignores the liberality with which leave to amend is to be granted, particularly when an intervening decision • has meaningfully altered the standard for pleading, see Moss v. U.S. Secret Serv., 572 F.3d 962, 972 (9th Cir.2009), and engages in a flawed futility analysis.[6] Thus, even under the majority’s misreading of Kio-bel’s “touch and concern” test, simply affirming the dismissal of plaintiffs’ ATS claims, without allowing plaintiffs a chance to conform their complaint to the majority’s previously unannounced standard, is not an appropriate or fair result.
The majority reaches its decision by improvidently extending Kiobel. Kiobel is limited to ATS claims by foreign nationals against foreign corporations concerning activities taking place on foreign soil. The Kiobel Court was “careful to leave open” for “further elaboration and explanation” a “number of significant questions,” 133 5.Ct. at 1669 (Kennedy, J., concurring), including the extent to which ATS claims against entities incorporated and domiciled in the United States, like defendants in this case, are justiciable.. In a separate opinion in Kiobel, four justices indicated that they would conclude jurisdiction exists under the ATS based solely on the fact that “the defendant is an American national.” Id. at 1671 (Breyer, J., joined by *618 Ginsburg, Sotomayor, and Kagan, JJ., concurring in the judgment).[7] As observed in that concurrence, “[m]any countries permit foreign plaintiffs to bring suits against their own nationals based on unlawful conduct that took place abroad.” Id. at 1675. Indeed, the principle that a sovereign may exercise jurisdiction to prescribe the conduct of its nationals outside its territory is widely recognized. See Restatement (Third) of Foreign Relations Law § 402(2) (1987).
In concluding that a defendant’s incorporation within the United States is an insufficient basis for jurisdiction under the ATS and that plaintiffs must allege some “conduct” within our borders, the majority misconstrues Kiobel’s “touch and concern” test, which is focused on the connection between the ATS “claims” and the United States. See 133 S.Ct. at 1669. As recognized by the Fourth Circuit in a decision issued after we heard oral argument in this case, the Kiobel Court’s use of the term “claims,” rather than “alleged tor-tious conduct” or similar phrases, in crafting the “touch and concern” standard was purposeful, “suggesting that courts must consider all facts that give rise to ATS claims, including the parties’ identities and their relationship to the causes of action.” Al Shimari v. CACI Premier Tech., Inc., 758 F.3d 516, 527 (4th Cir.2014). The majority, however, essentially disregards defendants’ U.S. citizenship, which is a fundamental feature of plaintiffs’ ATS “claims,” and which renders application of the ATS, by definition, not extraterritorial. Cf. Ahmed v. Magan, 2013 WL 4479077 (S.D.Ohio Aug. 20, 2013) (concluding that the presumption against extraterritoriality was rebutted by the defendant’s status as a permanent resident of the United States). Unless an ATS claim is premised purely on vicarious liability,[8] a defendant *619 who violates the law of nations while domiciled .in the United States must necessarily engage in at least one predicate act within our borders. The majority’s treatment of U.S. citizenship as just “one factor” among other unspecified factors simply begs the question of what act is sufficient or how many acts are enough to establish jurisdiction. I would instead hold that the ATS confers jurisdiction when an ATS claim is brought against a domestic corporation or other U.S. national, without any allegation of underlying conduct within the United States.[9]
The ATS was enacted by our First Congress as a means of vesting in the district courts jurisdiction to hear private causes of action for certain torts in violation of the law of nations, including piracy. See Sosa v. Alvarez-Machain, 542 U.S. 692, 724-25, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (citing 4 W. Blackstone, Commentaries on the Laws of England 68 (1769) [hereinafter “Blackstone”]). Piracy and its modern-day equivalents, including torture and genocide, are of particular concern to the sovereign bearing primary- responsibility for policing the activities of the perpetrators because failure to “animadvert upon them with a becoming severity” might render the sovereign “an accomplice or abettor of [its] subject’s crime, and draw[] upon [its] community the calamities of foreign war.” 4 Blackstone at 68; see also Cardona v. Chiquita Brands Int’l, Inc., 760 F.3d 1185, 1193 (11th Cir.2014) (Martin, C.J., dissenting) (“The United States would fail to meet the expectations of the international community were we to allow U.S. citizens to travel to foreign shores and commit violations of the law of nations with impunity.”). In focusing on the ATS “claims,” and not the underlying “conduct,” the Kiobel Court carefully left open the door through which foreign victims of heinous acts by U.S. nationals could hold such individuals or corporate entities accountable. The majority now unnecessarily slams the door shut.
Had plaintiffs conceded that no act related to the 1998 bombing in Santo Domingo occurred in the United States, the majority might have been justified in analyzing whether Kiobel should be extended to preclude ATS claims as to which the only “touch and concern” allegation is the fact of incorporation in the United States. Plaintiffs, however, suggested quite the opposite. They reminded us that the contract pursuant to which AirSean provided security services for Occidental in Colombia might have been executed within our borders. Cf. Al Shimari, 758 F.3d at 530-31 (holding that jurisdiction existed with regard to ATS claims arising from interrogations conducted by civilian contractors at the Abu Ghraib prison because- inter alia the contract to perform interrogation services in Iraq was issued in the United States to a U.S. corporation). In addition, far from capitulating about the absence of any financial or managerial connection between the corporate facilities in our country and the events in Santo Domingo, plaintiffs have asked for leave to amend, with the decision in Kiobel as their new guide. We should follow the lead of Doe I v. Nestle USA, Inc., 766 F.3d 1013 (9th *620 Cir.2014), and refrain from any “imprudent ... attempt to apply and refine the touch and concern test,” id. at 1028, when the pleadings before us were framed long before Kiobel was even conceived. For the reasons articulated in Doe I, I would reverse and remand this case to' allow plaintiffs to amend their complaint in light of Kiobel. See also Doe I & Doe VIII v. Exxon Mobil Corp., — F.Supp.3d -, -, 2014 WL 4746256, at *14 (D.D.C. Sep. 23, 2014) (“[T]he Court is of the view that plaintiffs should have the opportunity to file for leave to amend their complaint in light of the intervening change in the law created by Kiobel.”).[10]
B. State Law Tort Claims
1. Foreign Affairs Doctrine
The district court concluded that the foreign affairs doctrine precluded plaintiffs’ wrongful death, intentional infliction of emotional distress, and negligent infliction of emotional distress claims. See Mujica, 381 F.Supp.2d at 1187-88. While recognizing that tort law is within the traditional competence of the states, the district court reasoned that the strong federal foreign policy interests in this case, as evidenced by the Supplemental Statement of Interest filed by the United States, outweighed the weak interests of California concerning plaintiffs’ tort claims. Id.; see also Am. Ins. Ass’n v. Garamendi, 539 U.S. 396, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003). I would affirm this portion of the district court’s decision. The majority, however, expressly declines to examine whether dismissal on the basis of the foreign affairs doctrine was appropriate.
2. International Comity Doctrine
Instead of addressing the ground on which the district court actually relied in reaching its decision, the majority focuses on the district court’s refusal to premise the dismissal of plaintiffs’ state law claims on the doctrine of international comity. Declining to decide a matter on the basis of international comity is a form of absten *621 tion, and a district court’s decision whether to abstain is subject to review only for an abuse of discretion. JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C. V., 412 F.3d 418, 422 (2d Cir.2005); Remington Rand Corp.-Del. v. Bus. Sys. Inc., 830 F.2d 1260, 1266 (3d Cir.1987); see Stock W. Corp. v. Taylor, 964 F.2d 912, 918 (9th Cir.1992). In concluding that the district court abused its discretion, the majority relies on a very suspect version of the international comity doctrine, which it substitutes for the foreign affairs doctrine as the reason to dismiss plaintiffs’ state law claims. Although a district court’s ruling may be affirmed on alternate grounds, prudence weighs against doing so when the original ground for dismissal is sound and the substitute basis involves, as here, announcing novel views regarding the underlying legal doctrine and reliance on facts unsupported by the record.
The majority cites to a law review article that describes international comity as “one of the most important, and yet least understood, international law canons.” Donald Earl Childress III, Comity as Conflict: Resituating International Comity as Conflict of Laws, 44 U.C. Davis L.Rev. 11, 13 (2010). The majority’s opinion raises more questions than it answers. The article explains that international comity may take three forms: (i) legislative or prescriptive comity, involving the extraterritorial reach of domestic legislation; (ii) executive comity, which offers deference to foreign sovereignty; or (iii) adjudicative comity or the “comity of courts.” Id. at 47. To invoke legislative comity as a basis for abstaining from deciding the merits of a case, a court must conclude that a “true conflict between domestic and foreign law” exists. Hartford Fire Ins. Co. v. Cal., 509 U.S. 764, 798-99, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993). When a person subject to regulation by two countries can comply with the laws of both, no conflict exists. Id. at 799, 113 S.Ct. 2891.
Adjudicative comity arises in two contexts: (i) determining the preclusive effect or enforceability of a foreign ruling or judgment; or (ii) evaluating whether to stay or dismiss an action in a domestic court in favor of either a pending or future proceeding in a foreign forum. See 44 U.C. Davis L.Rev. at 47-48. The Eleventh Circuit has grouped these situations in a slightly different manner, describing “retrospective” application of adjudicative comity as either according respect to foreign judgments or deferring to parallel foreign proceedings, and “prospective” application as occurring when a domestic action is stayed or dismissed based on the respective interests of the domestic and foreign governments and the adequacy of the foreign forum in potentially resolving the dispute. See Ungaro-Benages v. Dresdner Bank A G, 379 F.3d 1227, 1238 (11th Cir.2004).
The Third Circuit has observed that, absent the “true conflict” required for legislative comity or a basis for “retrospective” application of adjudicative comity, United States courts “rarely” refrain from exercising their jurisdiction on the ground of international comity.[11] Gross v. German Found. Indus. Initiative, 456 F.3d 363, 393 (3d Cir.2006). Indeed, in Gross, the Third Circuit expressed skepti *622 cism about the Eleventh Circuit’s use of “prospective” adjudicative comity, which appears inconsistent with “our ‘virtually unflagging obligation’ to exercise the jurisdiction granted to us, which is not diminished simply because foreign relations might be involved.” Id. at 394 (citations omitted). I would join the Third Circuit in declining to follow the Eleventh Circuit down the “prospective” comity path. The majority, however, insists on forging ahead, despite the existence of a far less controversial basis for affirming the district court’s decision, namely the foreign affairs doctrine, and adopts the “prospective” application of the adjudicative comity rubric.
Along the way, the majority characterizes as an abuse of discretion the district court’s observation that, “at least in the Ninth Circuit, the application of international comity is generally limited to cases were there is a ‘true conflict’ between domestic and foreign law,” and its subsequent conclusion that “it must treat the existence of a ‘true conflict’ as a threshold requirement.” Mujica v. Occidental Petroleum Corp., 381 F.Supp.2d 1134, 1155 (C.D.Cal.2005) (citing In re Simon, 153 F.3d 991, 999 (9th Cir.1998)). Of course, In re Simon stands for the exact proposition stated by the district court, and contrary to the majority’s suggestion, In re Simon was not merely a prescriptive comity case. Rather,'consistent with principles of adjudicative comity, In re Simon considered the fact that “there is no conflicting proceeding in a foreign nation.” 153 F.3d at 999. Although I agree with the majority that the “true conflict” analysis discussed in Hartford was aimed solely at legislative or prescriptive comity, I am unwilling, in light of In re Simon and the Third Circuit’s reasoning in Gross, to conclude that adjudicative international comity, whether “retrospective” or “prospective,” does not contain a similar threshold.
I am also troubled by the majority’s application' of prospective adjudicative comity. When ruling on defendants’ motion to dismiss on forum non conveniens and international comity grounds, the district court concluded that Colombia was not, at that time, an adequate forum because plaintiffs would be barred from recovering against defendants because they had already received reparation from the Colombian government. 381 F.Supp.2d at 1147-48. On limited remand, the substitute district judge interpreted his task as determining whether prudential exhaustion applied to plaintiffs’ ATS claims; he did not engage in such analysis with respect to plaintiffs’ state law claims. The district judge concluded that exhaustion of local remedies was not required because the nexus between plaintiffs’ ATS claims and the United States was sufficiently strong, primarily because defendants are U.S. corporations, and the ATS claims involved matters of “universal concern.” I agree with this conclusion. See Sarei v. Rio Tinto, PLC, 550 F.3d 822, 824 (9th Cir.2008) (en banc).
The remainder of the substitute district judge’s order on limited remand, in which he indicated his belief that defendants can prove the availability of local remedies for plaintiffs’ claims and plaintiffs’ failure to exhaust them, is merely dictum. The majority, however, credits it over the earlier contrary conclusion of the original district judge, which was necessary to his decision to deny defendants’ motion on forum non conveniens and international comity grounds. To elevate, in this manner, dictum that was uttered for an entirely different purpose, concerning a wholly separate legal doctrine, contradicts virtually every principle of stare decisis and is simply not-the way in which our courts should operate.
*623 In addition, the majority’s conclusion that plaintiffs could have sued defendants in Colombia in September 2000, when they commenced their action against the Colombian government, is erroneously premised on defendants’ waivers of personal jurisdiction defenses, provided in connection with their August 2004 motion to dismiss for forum non conveniens. The record contains no basis for believing that defendants, who have made, throughout the 11-year span of this case, every possible argument that might justify dismissal, would have foregone such defenses had they actually been joined in the litigation in Colombia. In sum, because the dismissal of plaintiffs’ state law claims can be affirmed on the ground articulated by the district court, I see no reason to expand the scope of the international comity doctrine, particularly when the procedural posture and facts of this case do not support the result reached under the majority’s newly minted standard.
C. Conclusion
The majority needlessly announces novel standards that will' thwart the ability of not only these plaintiffs, but also of every other alien who seeks to hold a U.S. corporation accountable for atrocities committed abroad. Having enjoyed the benefits of incorporation within the United States', defendants in this case should also be required to answer in a court of the United States for any role they might have played in the 1998 bombing of Santo Domingo.

. Plaintiffs Luis Alberto Galvis Mujica ("Luis") and John Mario Galvis Mujica are brothers; plaintiff Mario Galvis Gelvez is their father. Certain of their claims, namely the claim under Cal. Bus. & Prof.Code §§ 17200 & 17204, and Luis's tort claims, were dismissed as time barred. Plaintiffs have not challenged such rulings on appeal.

. A prior panel of this Court remanded the matter for the district court to "consider whether a prudential exhaustion requirement applies in this case.” On remand, the case was reassigned, and the substitute judge devoted two pages of his order to the reasons why he was baffled by the directions on limited remand. Now that the matter has returned to us, defendants challenge whether we have jurisdiction. I agree with the majority that the case is properly before us on plaintiffs’ original notice of appeal.

. I do, however, concur with the conclusion that plaintiffs' claim under the Torture Victims Protection Act was appropriately dismissed because defendants are corporations.

.I would reverse the district court’s ruling on the political question doctrine. This case does not impact the relationship between the federal judiciary and the coordinate branches of the federal government. See Baker v. Carr, 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Plaintiffs’ ATS claims do not raise any issue that is constitutionally committed to. another political department, the standards for deciding plaintiffs’ ATS claims are "judicially discoverable and manageable,” plaintiffs’ ATS claims do not require an "initial policy determination” of a nonjudicial nature or an "unquestioning adherence to a political decision already made,” and resolution of plaintiffs' ATS claims will not express any lack of respect for the legislative or executive branches or subject the parties to "mul *617 tifarious pronouncements by various departments.” See id. at 217, 82 S.Ct. 691.

. The majority suggests that the pleading requirements of Rule 8 must be satisfied "before the discovery stage, not after it,” citing Ashcroft v. Iqbal, 556 U.S. 662, 678-79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), but Iqbal has not been understood by our sister circuits to so hold. See Menard v. CSX Transp., Inc., 698 F.3d 40, 45 (1st Cir.2012) (observing that "some latitude” is appropriate when the information needed for a "plausible” claim is in a defendant’s control, and cautioning that Iqbal and its predecessor, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), must be "tempered by sound discretion” to achieve “a sensible compromise between competing legitimate interests”); Loosier v. Unknown Med. Doctor, 435 Fed.Appx. 302, 307 (5th Cir.2010) (“As we have said in the past, we do not require plaintiffs to plead facts peculiarly within the knowledge of defendants.”); see also Amidax Trading Group v. S.W.I.F.T. SCRL, 671 F.3d 140, 149 (2d Cir.2011) (acknowledging that "a court should take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction,” but affirming the district court's denial of jurisdictional discovery because the relevant evidence was in the control of the plaintiff, not the defendants).

. The majority’s reliance on Bonin v. Calderon, 59 F.3d 815 (9th Cir.1995), for the proposition that futility "can, by itself, justify the denial of ... leave to amend,” id. at 845 (omissions by the majority), is misplaced in the context of this case. In Bonin, the assessment of futility had been performed in the first instance by the district court, and the issue on appeal was whether the district court had properly exercised its discretion. Id. at 845-46. In affirming the denial of leave to amend the petition for writ of habeas corpus, the Bonin Court simply agreed with the district court that the "proposed amendments are either duplicative of existing claims or patently frivolous, or both.” Id. at 846. Unlike in Bonin, which came to federal, court after trials in two different counties concerning the crimes committed in each, followed by direct appeals and state habeas corpus proceedings, we do not have the type of record that allows us to decide whether an attempt by plaintiffs to cure the deficiencies, if any, of their complaint would be futile.

. The majority incorrectly suggests that the opinion of these four Justices, concerning the sufficiency of U.S. citizenship to confer jurisdiction under the ATS, did not carry the day. Kiobel was decided on other grounds, and the Supreme Court explicitly left for another day the question presented in the instant case. The day for decision has now come, and we should accept the invitation of the concurring Justices and hold that U.S. citizenship is enough.

. In summarizing the holdings of various post -Kiobel decisions, the majority fails to recognize the distinction between vicarious liability and direct claims. In both Ben-Haim v. Neeman, 543 Fed.Appx. 152 (3d Cir.2013), and Balintulo v. Daimler AG, 727 F.3d 174 (2d Cir.2013), which the majority cites for the proposition that other federal courts have found U.S. citizenship alone inadequate, the ATS claims were premised solely on vicarious liability. In Ben-Haim, the principals whose actions were being challenged were all high-ranking Israeli officials, including a Justice of Israel’s Supreme Court, two former cabinet-level Ministers, and a judge of the Haifa Rabbinical District Court. 543 Fed.Appx. at 153. No allegation was made that the U.S. defendants, namely three charitable organizations, were directly involved in, or controlled the activities of the Israeli officials in connection with, the child custody disputes underlying the ATS claims; rather, the plaintiffs sought to hold the nonprofits vicariously liable for lobbying in favor of policies that allegedly promoted discrimination against fathers in Israeli courts. Id. Similarly, in Balintulo, the principals were not U.S. nationals, but rather South African companies, and the complaint alleged only vicarious liability of the named defendants, three U.S. corporations, of which the South African companies were subsidiaries. 727 F.3d at 192. Unlike Ben-Haim and Balintulo, this case involves direct liability, with allegations that, during the raid on San-to Domingo, which was planned in Occidental's office at Caiio Limón, three U.S. employees of AirScan manned the aircraft from which the targets of the cluster bombs were selected. Plaintiffs are entitled to the reasonable inference that such conduct could not have occurred absent financial and/or managerial support from defendants’ U.S. offices. See Navarro v. Block, 250 F.3d 729, 732 (9th Cir.2001) (for purposes of a Rule 12 motion, “all material allegations of the complaint are accepted as true, as well as all reasonable-inferences to be drawn from them”). After *619 all, we deal here not with whether plaintiffs have proven their ATS claims by a preponderance of the evidence, but instead with whether plaintiffs have pleaded “only enough facts to state a claim to relief that is plausible on its face.” Twombly, 550 U.S. at 570, 127 S.Ct. 1955.

. As indicated elsewhere in this partial dissent, if U.S. incorporation is not sufficient to confer jurisdiction over plaintiffs’ ATS claims, I would at least allow plaintiffs an opportunity to amend their complaint to satisfy the "touch and concern” requirements imposed by the majority.

. The majority cites this and several other district court decisions in an attempt to demonstrate some weight of authority in support of its misreading of Kiobel. Two of these cases, however, are decided on alternate grounds, including the plaintiff's lack of standing, Ahmed-Al-Khalifa v. Al-Assad, 2013 WL 4401831 (N.D.Fla. Aug. 13, 2013), and the plaintiff’s failure to qualify as "an 'alien' who may file suit under the ATS,” Mwangi v. Bush, 2013 WL 3155018 (E.D.Ky. June 18, 2013). Two other cases involve defendants who were neither U.S. citizens nor U.S. residents at the time they allegedly committed heinous acts on foreign soil. Warfaa v. Ali, - F.Supp.3d -, 2014 WL 3734121 (E.D.Va. July 29, 2014); Mamani v. Berzain, 21 F.Supp.3d 1353, 2014 WL 2069491 (S.D.Fla.2014). Yet other opinions concern motions for summary judgment, which require much more of the opposing party than the Rule 12 motion currently at issue, see Adhikari v. Daoud & Partners, 2013 WL 4511354 (S.D.Tex. Aug. 23, 2013), modified on other grounds, 994 F.Supp.2d 831 (S.D.Tex.2014); Giraldo v. Drummond Co., 2013 WL 3873960 (N.D.Ala. July 25, 2013), address a problem of potentially inconsistent judgments, which is not relevant here, see Jovic v. L-3 Servs., Inc., - F.Supp.3d -, -, 2014 WL 4748614, at *6 (N.D.Ill. Sep. 24, 2014) (observing that the Croatian military leaders who participated in Operation Storm, which the U.S. defendants allegedly helped plan and execute, were convicted of war crimes, but their convictions were later overturned), or are otherwise distinguishable, see Doe I v. Cisco Sys., Inc., — F.Supp.3d -, 2014 WL 4446381, at *5 (N.D.Cal. Sep. 5, 2014) (ruling that the plaintiffs had failed to establish the defendants "directed, planned, or committed the violations that occurred in China”); see also In re South African Apartheid Litig., 2013 WL 6813877 (S.D.N.Y. Dec. 26, 2013) (relating to Balintu-lo, a vicarious liability case). For the foregoing reasons, the various district court decisions on which the majority relies are of little persuasive value.

. As recognized by the district court, neither legislative comity nor retrospective adjudicative comity are relevant in this case. See Mujica v. Occidental Petroleum Corp., 381 F.Supp.2d 1134, 1154-64 (C.D.Cal.2005). No “true conflict” exists between the laws of the United States and the laws of Colombia concerning the bombing of civilians, no foreign judgment has been procured by or against defendants, and no foreign proceedings involving defendants were ever ongoing.